UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| DEBORAH A. MAYER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:04-CV-1695-SEB-VSS |
| | ) | |
| MONROE COUNTY COMMUNITY | ) | |
| SCHOOL CORPORATION, et al., | ) | |
| Defendants. | ) | |

**ENTRY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Deborah A. Mayer ("Mayer") filed her Complaint in this action on
October 5, 2004 in the Monroe County Circuit Court and, on October 18, 2004, the case
was removed to this court by Monroe County Community School Corporation
("MCCSC" or "School") and its Superintendent John Maloy, individually and in his
representative and official capacity as School Superintendent; Cheryl Brown, individually
and in her capacity as President of the School Board; Victoria Rogers, individually and in
her capacity as Principal of Clear Creek Elementary School; and Pam Sklar, individually
and in her capacity as Director of Human Resources for the School Corporation
(collectively the "Defendants"), pursuant to 28 U.S.C. § 1441 and § 1446.  Now before
the Court is Defendants' Motion for Summary Judgment on each of the four counts in the
Complaint.

We summarize the four counts in Ms. Mayer's Complaint as follows: Ms. Mayer

alleges that the School Defendants: (1) violated her rights under the First Amendment after she spoke out against the Iraq war (Count I); (2) conspired together to violate her civil rights in violation of 42 U.S.C. § 1985 (Count II); (3) breached her employment contract (Count III); and (4) failed to follow the legal requirements imposed by the Indiana's Teacher Tenure Act prior to the non-renewal of her contract (Count IV). (Def.s' Reply in Supp. at 1.)

Defendants maintain that Count I of the Complaint must be dismissed because Ms. Mayer's comments regarding Iraq were not protected speech under the First Amendment. Count II must be dismissed because § 1985(3) does not apply where there is an "intra-corporate" conspiracy. Count III warrants dismissal based on a lack of evidence to establish that Plaintiff's contract was improperly terminated, in fact, to the contrary, the evidence shows that her termination was based on her inability to work with students and parents. Regarding Count IV, Defendants assert that they have met all the requirements imposed on them by state law under the Indiana Teacher Tenure Act.

### <u>Plaintiff's Motion to Strike Defendants' "Statement of Material Facts"</u>

As a preliminary matter, we address Plaintiff's motion to strike a substantial portion of Defendants' submissions in support of the pending motion. In "Plaintiff's Response to Defendants' Motion for Summary Judgment" [hereinafter Pl.'s Resp.], Plaintiff objects to and moves to strike the portion of Defendants' Brief labeled "Statement of Material Facts" claiming that it fails to "include a section labeled 'Statement of Material Facts Not in Dispute' containing the facts potentially

2

determinative of the motion as to which the moving party contends there is no genuine issue" as required by Local Rule 56.1(a).  Pl.'s Resp. at 4.

In response, Defendants state that, by inadvertence, they omitted three words, "not in dispute," from the heading of their moving brief but that this small error in no way prejudiced Ms. Mayor, nor was it done in bad faith.  (Def.s' Reply in Supp. at 10, <u>citing</u> <u>Bell v. Bowman, Heintz, Boscia & Vician, P.C.</u>, 370 F. Supp. 2d 805, 806 n.1 (S.D. Ind. 2005) (denying plaintiff's motion to strike as violation of L.R. 56.1 did not prejudice plaintiff); <u>see also</u> <u>Luttrull v. McDonald's Corp.</u>, No. 3:04-CV-00117-JDT-WG, 2004 WL 2750244 at *6 n.6 (S.D. Ind. Nov. 2, 2004) (finding that a violation of L.R. 5.2(a)(3) was not willful or in bad faith and therefore denied plaintiffs' motion for sanction and to strike)).

Because there is no evidence to show that Defendant's failure to conform completely to the requirements of L.R. 56.1 caused any real prejudice to Plaintiff, nor that the omission of these words was done in bad faith, the Court <u>DENIES</u> Plaintiff's motion to strike the section in Defendants' brief labeled "Statement of Material Facts."  <u>See</u> L.R. 56.1(i) (stating that "[t]he Court may, in the interests of justice or for good cause, excuse the failure to comply strictly with the terms of this rule.")

## **Factual Background**

On August 12, 2002, Ms. Mayer applied for a substitute teaching position at Clear Creek Elementary School ("Clear Creek" or "the School") in Bloomington, Indiana.

(Mayer Dep. Exh. 1).  When the LAUnCHED[1] classroom teacher, Steve Cole, quit his position at Clear Creek two weeks into the school year, the School moved Ms. Mayer from her substitute position into the full-time position to teach the LAUnCHED class. (Rogers Depo., p. 27-28).  Ms. Mayer had a one-year contract with Defendant MCCSC and was a non-tenured probationary teacher for the 2002-2003 school year, and her contract was not renewed as of April 24, 2003.

***Classroom Discussion of Peace and the War in Iraq***

Ms. Mayer used the "Time for Kids" ("TFK") newsletter nearly every Friday to teach her students about current events.  (Complaint, ¶¶ 19-20; Mayer Dep. p. 60).  The TFK newsletter was a part of the approved curriculum at Clear Creek and the LAUnCHED classroom.  (Mayer Dep. p. 57-58, 60).  On January 10, 2003, Plaintiff taught a class, using the TFK December 13, 2002 issue, which discussed peace marches in Washington, D.C. conducted in protest of U.S. involvement in the war in Iraq. (Complaint, ¶ 20; Pl.'s Resp. at 1).  In her deposition testimony,  Ms. Mayer described her discussion of the article as follows:

> After we had talked about some of the other things that had happened, one of the kids asked me—and we had read the article about the peace march in Washington, D.C., one of the kids asked me if I would ever march in a peace march.  At that time I said, "Peace marches are going on all over the country.  We even have demonstrations here in Bloomington, Indiana.  When I drive past the courthouse square and the demonstrators are picketing I honk my horn for peace because

---

[1] The LAUnCHED classroom is designed to provide an alternative learning experience in a multi-age setting for students of all abilities in grades 4-6.

4

their signs say, 'Honk for Peace.'

And then I went on to say that I thought that it was important for people to seek out peaceful solutions to problems before going to war and that we train kids to be mediators on the playground so that they can seek out peaceful solutions to their own problems and so they won't fight and hurt each other. And that was the extent of the conversation and the discussion.

And it lasted probably no more than five minutes.

(Mayer Dep., p. 62). Ms. Mayer characterized her discussion in a similar manner in her

Complaint, stating, in part:

During the discussion, one student asked Plaintiff if she would ever march in a peace march. Although she did not usually give her opinion in class, in this case she explained that peace marches were taking place all over the country, including in Bloomington . . . She stated that she thought peace was an option to war and that peaceful solutions should be sought before going to war.

(Complaint, ¶ 20).

### *School's Response to Ms. Mayer Imparting her Opinions on Peace to the Class*

Mr. and Ms. Hahn had a daughter in Ms. Mayer's classroom, and, on January 13,

2003, a meeting was held at their request with Ms. Mayer and Principal Rogers to

complain about Ms. Mayer's discussion of the Iraq war in the LAUnCHED classroom.

(Hahn Aff. ¶¶ 6-8). Plaintiff claims that at this meeting Principal Rogers unilaterally

prohibited Ms. Mayer from discussing peace in her classroom, when she responded to an

angry Mr. Hahn who was seeking some restraint by Ms. Mayer on the subject, saying "I

think she can do that. I think she can not mention peace in her class again." (Pl.'s Reply

5

at 30; Mayer Dep., pp. 74-76).  Plaintiff asserts that this action by the Principal chilled her from speaking about the war in Iraq or peace because she feared losing her job if she again addressed the issue in class.  (Pl.'s Reply at 30; Mayer Dep., p. 76).

Following the meeting with the Hahns, Principal Rogers circulated a written memo entitled "Peace at Clear Creek."  (Pl.'s Reply at 30-31).  The memo, identified as being "From the Principal," said, in relevant part:

> We are living in scary times with the treat [sic] of war and a high level of concern for everyone's personal safety.  For many years at Clear Creek, we have had an annual Peace Month in January and support the peaceful solution of problems through mediation.  This continues to be a focus for the way we solve problems here.  Learning requires a peaceful environment.
>
> We absolutely do not, as a school, promote any particular view on foreign policy related to the situation with Iraq.  That is not our business.  Individuals in a democracy have personal beliefs, but a public school acknowledges various points of view and those might be discussed related [to] current events and the news.
>
> Do we talk about peace at school?  Yes, as a general approach to solving problems at Clear Creek.  Please do not confuse that educationally sound goal with a stance on foreign policy.

(Id.)  At the meeting where Principal Rogers handed out the "Peace at Clear Creek" memo, she told the teachers that Peace Month was being cancelled.  (Mayer Dep., p. 88).  Plaintiff was asked at her deposition:  "What was your understanding when you left the faculty meeting as to whether or not you could discuss peace in the classroom?"  Ms. Mayer answered, "I thought it was pretty clear that we couldn't discuss peace in the

6

classroom, but I thought that it was specifically in regard to the war with Iraq because in the peace memo it talks about the situation in Iraq."  (Pl.'s Reply at 32; quoting Mayer Dep., pp. 89).

***Parental Complaints Regarding Ms. Mayer's Teaching Techniques***

The Defendants' briefings in support of summary judgment contain extensive facts of alleged parental complaints.  These alleged factual assertions, though supported by depositions and affidavits, are disputed by Ms. Mayer.[2]  (Pl.'s Resp. at 4).  Ms. Mayer states in her affidavit that "[m]oving of students was not something unique to my classroom."  (Mayer Aff. ¶ 7).  Despite there being numerous parent complaints, it appears that only one – from the Hahns – complained of Ms. Mayer's discussion of the Iraq war and peace protests.

<u>The Hahns</u>

As mentioned previously, Mr. and Ms. Hahn's daughter was in Ms. Mayer's classroom, and on January 13, 2003, a meeting was held at their request between themselves, Ms. Mayer and Principal Rogers to complain about Ms. Mayer's discussion of the Iraq war during the LAUnCHED classroom session.  (Hahn Aff., ¶¶ 6-8.  The Hahns claim they were also concerned about Ms. Mayer's general classroom management

_____

[2] "Because of the volume of evidence and complexity of issues in this case, it is not practical for Plaintiff to respond in this brief to each and every allegation made by the parents in their affidavits and included in the 'Statement of Material Facts' section of Defendants' brief.  Plaintiff does, however, dispute nearly all of the statements made by the parents in their affidavits, as is shown very clearly in Plaintiff's Affidavit.  (See Plaintiff's Attachment F, Affidavit of Deborah Mayer)."  Pl.'s Resp. at 4.

and their daughter's educational progress, stating that their 6th grade daughter was being given 5th grade math problems.  (Id. ¶¶ 4, 6, 7; Exh. "A" of Hahn Aff.).  According to the Hahns, Ms. Mayer indicated to them that she would not change her teaching style only to accommodate their daughter and made comments that their daughter was lying about her teaching style and classroom management.  (Id.)  According to Principal Rogers, Ms. Mayer's conduct bordered on being unprofessional during the meeting with the Hahns.  (Rogers Dep., p. 199).  Ms. Mayer claims that at the meeting, they did not discuss teaching style or classroom management; they discussed only Ms. Mayer's comment about peace demonstrations.  (Mayer Aff. at ¶¶ 7, 8).

Following the meeting, Ms. Hahn again complained to Principal Rogers charging that Ms. Mayer continued to discuss her opinions on the war despite being instructed on January 13, 2003, to refrain from doing so.  (Hahn Aff., ¶ 9).  On February 5, 2003, Ms. Hahn e-mailed Principal Rogers, noting that:

> "[i]t seems Ms. Mayer is still lecturing the class to protest the war.  I have instructed [my daughter] that the next time this occurs I want her to report to the office and ask to call home to be picked up.  I have full confidence that you will support this action."

(Rogers Dep., p. 87).  Principal Rogers forwarded the e-mail to Ms. Mayer on February 6, 2003.  (Id.)  Thereafter, the Hahns came to view that Ms. Mayer retaliated against their daughter for their having met with Ms. Mayer on January 13, 2003, reporting that at one point Ms. Mayer laughed in their daughter's face as she told her she could not speak to Principal Rogers.  (Hahn Aff., ¶ 10).  Ms. Mayer states that she did not treat the Hahn's

daughter poorly, she did not laugh in her face, nor did she discuss peace after January 13, 2003.  (Mayer, Aff. ¶¶ 9, 10).

The Hahns requested that their daughter be placed in another classroom, but the school was unable to accommodate their request.  ((Def.s' Reply in Supp. at 12-13; citing Hahn Aff., ¶ 12)  Therefore, the Hahns transferred their daughter to a private school in March of 2003.  (Id. at ¶ 13).  Ms. Mayer states in her affidavit that "[m]oving of students was not something unique to my classroom."  (Mayer Aff. ¶ 7).

<u>The Quallses</u>

Andy and Barbara Qualls ("the Quallses") expressed similar concerns regarding Ms. Mayer's instruction of their daughter to both Principal Rogers and Ms. Mayer during the first and second semesters of the 2002-2003 school year.  (Rogers Dep., p. 28-29).  The Quallses first complained to Ms. Mayer during the October 2002 parent-teacher conference that their fifth grader was being assigned fourth grade math problems.  (Qualls Aff., ¶ 5; Rogers Dep., p. 76).   The Quallses also complained that Ms. Mayer displayed a negative attitude toward them when she said to them that she knew what she was doing despite their concerns.[3]  (Qualls Aff., ¶ 6).  They also believed that Ms. Mayer retaliated

---

[3]  The Quallses had additional complaints, although it is unclear if or when these issues were communicated to Ms. Mayer and or Principal Rogers.  For example, they assert that: (1) Ms. Mayer would not permit their daughter to help out in the classroom; (2) Ms. Mayer would accuse the students of not turning in work; (3) students were not allowed to progress at their own pace and were treated like kindergartners; (4) Ms. Mayer would yell "shut up" in the classroom; (5) Ms. Mayer implied that the Quallses' daughter forged her mother's initials on a worksheet; and (6) Ms. Mayer refused to let the Quallses' daughter return to the gymnasium to retrieve her eyeglasses.  (Qualls Aff'd. at
(continued...)

against their daughter after they expressed their concerns.  (Id. at ¶ 12).  On February 28, 2003, the Quallses wrote a five-page letter to Principal Rogers expressing their concerns regarding Ms. Mayer's actions and teaching methods.  (Qualls Aff., 15; attached to Qualls Aff. as Exh. A).  The Quallses' daughter was moved to Mr. Mont's classroom for the fourth nine-week period.  (Def. Memo in Supp. at 12; Qualls Aff., ¶ 17).

Ms. Mayer states that she did not know of the Quallses' detailed letter nor any of the concerns voiced in it, learning of it only during discovery for this lawsuit.  (Mayer Aff. ¶ 15).  Ms. Mayer believe that the problems with the Qualls started when another student was removed from her classroom, and their daughter wanted to be moved into the same class with her friend.  (Mayer Aff. ¶ 16).

<u>The Millers</u>

Tamby Miller ("Ms. Miller"), who also had a daughter in the LAUnCHED class, complained that Ms. Mayer made demeaning comments to her daughter and other classmates that made her daughter unable to focus on her homework after school.  (Miller Aff., ¶ 4).  Ms. Miller believes that Ms. Mayer told her students that she once taught Kindergarten and her Kindergarteners were smarter than the students she now taught in the LAUnCHED program. (Miller Aff., ¶ 5).  According to Ms. Miller, her daughter

---

[3](...continued)
¶¶ 7-10, 13, 14).  Ms. Mayer's actions caused the Quallses' daughter to frequently cry because she hated going to school.  (<u>Id.</u> at ¶ 11; Rogers Depo., p. 198).  Ms. Mayer denies or explains these comments with responses such as "If you were to ask any student in my classroom, 'Who laughs most in this class?' they would unanimously answer, "C.Q.." . . . She was not unhappy at school.  Her mother did not tell me she cried at home."  (Mayer Aff. ¶ 11).

suffered from anxiety and low self-esteem while she was a student in Ms. Mayer's classroom, due to Ms. Mayer's negativity and poor classroom management.  (Miller Aff., ¶ 7).

Ms. Mayer states that she did not make derogatory comments about students and did not tell her students that her kindergartners were smarter than they were.  Ms. Mayer claims that other teachers and Ms. Miller told her that Ms. Miller's daughter was better adjusted in Ms. Mayer's class than in previous classes.  (Ms. Mayer Aff., ¶¶ 4, 5, 6).

Ms. Miller stated that she expressed her concerns on several occasions to Ms. Mayer and Principal Rogers in October of 2002.  (Miller Aff., ¶ 8).  Moreover, according to Ms. Miller, Ms. Mayer laughed at her during one of the meetings when Ms. Miller was discussing Ms. Mayer's negative comments.  (Id. at ¶ 9).  Principal Rogers told Ms. Mayer in front of Ms. Miller that it was not a laughing matter.   Ms. Mayer claims that she did not laugh in Ms. Miller' face although she smiled when she was asked to not give her class reading and writing homework on Mondays, Tuesdays, or Wednesdays because the Millers' daughter had to travel to gymnastics on those days and couldn't read in the car.  (Mayer Aff. at ¶ 9).

Ms. Miller spoke with Principal Rogers and Ms. Mayer again following the 2002 Thanksgiving break because Ms. Mayer had not accommodated her concerns and because she wanted her daughter transferred to another LAUnCHED classroom.  (Miller Aff., ¶ 12).  Ms. Miller's daughter was transferred in February 2003 to Ms. Sterner's classroom. (Def. Memo in Supp. at 12; Miller Aff., ¶ 14).  Ms. Mayer states that the Miller daughter

was placed with Ms. Sterner because she was a former gymnast, and the Miller daughter

was not required to do reading homework on those days in Ms. Sterner's classroom.

(Mayer Aff., ¶ 9).

<u>The Mullises</u>

Lisa and Troy Mullis's ("the Mullises") daughter was in the 5th grade and

assigned to Ms. Mayer's class.  During the October 2002 parent-teacher conference, Ms.

Mullis states that she expressed concern that her daughter's grades were slipping to which

Ms. Mayer responded that her daughter was a "needy" student.  (Mullis Aff. at ¶ 5).  Ms.

Mayer states that Ms. Mullis expressed no concern that her daughter's grades were

slipping and denies expressing to Ms. Mullis that her daughter was a "needy" student.

Following the parent-teacher conference, Mr. Mullis attempted to speak again with Ms.

Mayer about his daughter's grades and found Ms. Mayer to be very hostile and degrading

during their conversation.  (Mullis Aff. at ¶ 6).  Ms. Mayer denies that Mr. Mullis

attempted to speak with her after the Parent Conference, but alleges that he verbally

assaulted her outside the principal's office her first week of school for not allowing his

daughter to each chips in class and requiring his daughter to take a pass to the restroom.

(Mayer Aff. ¶ 6).

The Mullises saw Ms. Mayer as exhibiting a "my way or the highway" approach in

response to their concerns.  (Mullis Aff. at ¶ 6).  The Mullises spoke with Principal

Rogers on approximately five occasions during the school year to complain about Ms.

Mayer's teaching style and classroom management.  (Mullis Aff. at ¶ 7).  Ms. Mayer

claims that she was not aware that the Mullises spoke with Principal Rogers five times, and that the Mullises did not attempt to contact her nor did they mention their concerns to her. (Mayer Aff. at ¶¶ 7 and 10). The Mullises believed that Mayer retaliated against their daughter after they had complained about Ms. Mayer. (Mullis Aff. at ¶ 8). Ms. Mayer denies this claim stating that she did not know that the Mullises had even spoken with Principal Rogers. (Mayer Aff. at ¶ 8). At their request, Principal Rogers removed their daughter from Ms. Mayer's class and placed her in another classroom. (Mullis Aff. ¶¶ 14, 17). Ms. Mayer states that she was not involved in the decision to remove the Mullises' daughter from her class, nor was she given a reason for the move. (Mayer Aff., ¶ 13).

<u>The Burgesses</u>

Sherry Burgess ("Ms. Burgess") also reported problems with Ms. Mayer regarding her daughter's Individualized Education Plan ("IEP"). (Burgess Aff., ¶ 5). Ms. Burgess met with Ms. Mayer and Principal Rogers in October of 2002 to discuss the IEP. (Burgess Aff., ¶ 4). Ms. Burgess complained that Ms. Mayer consistently failed to follow the IEP and told Ms. Burgess that she did not have time to implement the plan. (Id. at ¶ 5). Among other complaints, Ms. Burgess contends that Ms. Mayer treated her daughter unfairly. (Id. at ¶¶ 6-7). Ms. Burgess met with Ms. Mayer, Principal Rogers, and the Inclusion Teacher in early 2003 to again complain that Ms. Mayer was not following her daughter's IEP. (Id. at ¶¶ 8-9).

Ms. Mayer states that if Ms. Burgess's daughter had an IEP (prior to May 2003), it

was never given to her, although she did follow her behavioral contract diligently. (Mayer Aff., ¶¶ 4, 5). Ms. Mayer states that the only meeting she had with Ms. Burgess present was a required end-of-year case conference to discuss her daughters progress along with twelve other people.

<u>The Foshas</u>

Sherilyn and Joel Fosha were also vocal in their criticisms of Ms. Mayer and the relationship between the Foshas and Ms. Mayer deteriorated seriously during the second semester. (Fosha Aff., ¶¶ 5-12). The Foshas' daughter, who did not have problems with her grades prior to entering Ms. Mayer's classroom, was receiving failing grades in Ms. Mayer's class. (Id. at ¶¶ 5-6; see also Rogers Dep. p. 119). The Foshas conveyed their concerns to Ms. Mayer and stressed that they were interested in cooperating with her to improve their daughter's performance, but Ms. Mayer displayed a negative attitude and made no effort to accommodate the Foshas' concerns. (Fosha Aff., ¶¶ 7, 11) As with the other parents, the Foshas found that Ms. Mayer's attitude was a "my way or the highway" approach, that she unfairly targeted students whom she deemed difficult and that she had poor classroom management skills. (Id. at ¶¶ 8-10). The Foshas' daughter was eventually transferred to Ms. Campbell's classroom. (Def.s' Memo in Supp. at 12; citing Fosha Aff., ¶ 13).

Ms. Mayer acknowledges that the Foshas complained that their daughter did not approve of a certain hand gesture that Ms. Mayer made to tell students to wait. However, she claims that she worked diligently and patiently with the Foshas allowing

14

them to call her often and at home. (Mayer Aff. ¶¶ 9, 10). Ms. Mayer claims that the Foshas' daughter was pulled from her class because of the prospect of a potential lawsuit if she remained in her class with another student, who implicated each other in a sexual harassment incident. (Mayer Aff. ¶ 12).

    <u>The Perrys</u>

    Another set of parents, the Perrys, also insisted that their daughter be removed from Ms. Mayer's classroom, based on the allegations laid out by them in their Harassment Complaint against Ms. Mayer. (Roger Dep., p. 52; Defendants' Responses to Plaintiff's First Request for Production of Documents, Notes from Meeting with Mayer re: Harassment Complaint [at Docket No. 29]). In response to that Complaint, the Vice Principal, Tammy Miller, told Ms. Perry that her daughter could not be moved to another classroom at that point because there were only three days of school remaining. (Id.)

***Ms. Mayer's Formal Evaluations and Feedback***

    On February 7, 2003, Principal Rogers sent Ms. Mayer a "formal letter of concern regarding the apparent lack of success that [Ms. Mayer demonstrated] in creating a positive learning environment in [her] LAUnCHED classroom." (Def.s' Memo. in Supp. at 8; citing Exh. 13). In the letter, Principal Rogers stated that she was "[m]oving select students from [her] class to defuse the present volatile situation." (Id.) She also placed Ms. Mayer on an improvement plan and directed her to work with Michelle Henderson to implement a positive learning environment, to attend weekly improvement meetings, and to improve her "interpersonal skills" and "[r]efrain from presenting [her] political views"

in the classroom.  (Id.)

Less than a month after Principal Rogers's formal letter of concern was issued to Ms. Mayer, on March 10, 2003, the Hahns filed a complaint against Ms. Mayer under the School's Harassment policy, (Def.s' Memo in Supp. at 9, citing Hahn Aff., ¶ 11, attached to Hahn Aff. as Exh. A), alleging that "Ms. Mayer has harassed and intimidated Elise Hahn in a progressively worse fashion since [the January 13, 2003] meeting" and that "Ms. Mayer has ridiculed, embarrassed, made false accusations, and given unjust punishments to Elise."  (Id.)  They also complained about Ms. Mayer's continued expressions of political views in the classroom, even after being asked to stop, and that Ms. Mayer ignored School policy by failing to teach Elise according to her special needs. (Id.)  The Hahns demanded the "[t]ermination of Ms. Mayer's employment [and] [r]eimbursement of funds to enroll Elise in a private school since Clear Creek will not put her in another class."  (Id.)  Ms. Mayer states in her affidavit that she was shown this complaint for the first time at her deposition on May 20, 2005.  (Mayer, Aff. ¶ 11).

On March 26, 2003, Principal Rogers sent another memorandum to Ms. Mayer, this time to set up a "[m]eeting to discuss ongoing concerns/reminder."  (Def.s' Memo in Supp. at 10; citing Rogers Dep., pp. 101-102, Exh. 15).  Principal Rogers wrote that "[i]t is imperative that we meet immediately to generally discuss concerns about your interactions with parents and your choice of classroom management strategies."  (Id.) She also noted that the Hahns had filed "a complaint at the central administrative level." (Id.; Hahn Aff. ¶11, attached to Hahn Aff. as Exh. A)  In addition to scheduling the

16

meeting, Principal Rogers also directed Ms. Mayer to attend a workshop on "Dealing with Difficult Parents." (Rogers Dep., pp. 103-04, Exh. 15).

On March 27, 2003, Ms. Mayer met with Principal Rogers, the Director of Human Resources Pam Sklar, and the Monroe County Education Association Building Representative, Carol Carter, to discuss the problems in the LAUnCHED classroom, and more specifically, Ms. Mayer's problems with the Foshas and the Hahns. (Def. Memo in Supp. at 10; citing Rogers Dep., p. 119, Exh. "17"). Ms. Mayer was directed to consider these issues over the weekend and to advise Principal Rogers on Monday, March 31, 2003, of the steps she could take to remedy the situation. (Id.) However, Ms. Mayer failed to heed this directive, necessitating, on April 1, 2003, another letter from Principal Rogers to Ms. Mayer summarizing the events and directing her to respond by April 2, 2003:

> I must have your response toward solving this problem tomorrow. (4/2/03). Any longer delay is not acceptable. You have many strengths; however, communicating with parents constructively is an area of needed growth. Let's make this a success!

(Id.) Ms. Mayer did not report to work between April 1 and April 14, 2003, but did send an e-mail to Principal Rogers stating: "I am ill today and not able to respond to all of your comments. I will communicate with you as soon as I am able." (Def.s' Memo. in Supp. at 10; citing Mayer Dep., p. 125-126, Exh. 7 (Absence Report), Exh. 13). On April 6, 2003, Ms. Mayer sent Principal Rogers a three-page response to the April 1, 2003 letter. (Def.s' Memo in Supp. at 11, citing Mayer Dep. p. 130, Exh. 14). Ms. Mayer noted her

17

"concern for the animosity that you [Principal Rogers] have directed toward me during

the past few months," stating:

> Since the day I announced that I would be looking for
> employment elsewhere for next year as a result of the
> proposed RIF, you have taken measures to discredit me as a
> professional.  Your pattern of behavior stemming from that
> time is incomprehensible to me and my colleagues but may
> explain why four teachers have occupied my present position
> in the past calendar year.

(Id.)  She then listed 22 events of alleged harassment and claimed that due to this

harassment she had missed five days of work due to illness.  (Id.)  She also noted that

Principal Rogers had "a personal vendetta" against her and that "[a]ny further harassment,

including the lack of a positive recommendation, will result in legal action on my behalf."

(Id.)

On April 8, 2003, Ms. Mayer failed to attend a faculty meeting.  (Def. Memo in

Supp. at 11, citing Mayer Dep., p. 139, Exh. 15).  Following the meeting, Principal

Rogers sent a memorandum on April 9, 2003, suggesting to Ms. Mayer that she review

the materials from the faculty meeting as they "would have been helpful to you in

analyzing your interactions with parents and students."  (Id.)  She also asked Ms. Mayer

to provide times for observations and the weekly progress meetings.  (Id.)  Ms. Mayer

responded to the memorandum by agreeing to attend the progress meetings.  (Mayer

Dep., p. 139, Exh. 16).

***Termination of Ms. Mayer's Employment***

Principal Rogers visited Ms. Mayer's classroom for formal observations twice

18

during the second semester, once on February 28, 2003, and again on April 16, 2003. (Def.s' Memo. in Supp. at 13; Rogers Dep., p. 23, Exh. 7, Exh. 8).  On the basis of these observations, as well as other meetings and parent comments, on April 24, 2003, Principal Rogers prepared a Staff Member End-Of-Year report, (Pl.'s Memo. in Supp. at 13; Rogers Dep., p. 23, Exh. 14), in which she cataloged the problems with Ms. Mayer's performance and indicated that she would be recommending "Contract termination." (Id.)  At a 1:00 pm meeting on April 24, 2003, Principal Rogers, Assistant Principal Miller, and Ms. Carter met with Ms. Mayer to discuss the End of Year report and Principal Rogers's recommendation.  (Rogers Dep., p. 171; Mayer Dep., p. 143,  Exh. 18).  During the meeting, Ms. Mayer was given the opportunity to resign.  (Id. at 144). Before responding to that option, Ms. Mayer left the meeting and then departed the building.  (Id. at 144-146).  Later that day, Ms. Mayer telephoned Principal Rogers to reject the resignation option and told Principal Rogers of her intention to contact her attorney.  (Rogers Dep., p. 172; Mayer Dep., p. 147, Exh. 18).

It is undisputed that the School Board met in a regularly scheduled public session on the evening of April 24, 2003 and unanimously voted not to renew Ms. Mayer's contract.  (Mayer Dep. pp. 143, 149; Defendants' Responses to Plaintiff's First Request for Production of Documents, Minutes of Special Meeting).  This lawsuit by Plaintiff challenging her termination ensued.

## Legal Analysis

**A.     Standard of Review**

Summary Judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).   On a motion for summary judgment, the burden rests on the moving party, Defendants in this case, to demonstrate "that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp., 477 U.S. at 325.  After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment.  Id. at 322-24.  "[I]f the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994), (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); Celotex, 477 U.S. at 322-24.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge, 24 F.3d at 920.  Therefore, in considering a motion for summary judgment, we draw all reasonable inferences in favor of the non-movant.  Venters v. City of Delphi, 123 F.3d 956, 962 (7th Cir. 1997).  If genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion,

summary judgment is inappropriate.  See Shields Enters., Inc. v. First Chicago Corp., 975

F.2d 1290, 1294 (7th Cir. 1992).  But if it is clear that a plaintiff will be unable to satisfy

the legal requirements necessary to establish his or her case, summary judgment is not

only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Waldridge, 24 F.3d at 920.

Further, a failure to prove one essential element "necessarily renders all other facts

immaterial."  Celotex at 323.  A plaintiff's self-serving statements, unsupported by

specific concrete facts reflected in the record, cannot preclude summary judgment.

Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Slowiak v. Land

O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

### B.    Count I:    1st Amendment Claim

Ms. Mayer asserts two First Amendment claims against the School: first, that in

discussing her opposition to the Iraq war in the classroom, she exercised her First

Amendment rights and that the School retaliated against her by harassing her and

ultimately firing her.  (Pl.'s Memo in Supp.; Complaint ¶¶ 20, 49).  Her second claim is

that Defendants' actions chilled her free speech entitlements.  Defendants rejoin that Ms.

Mayer's speech was not constitutionally protected because it occurred in her classroom in

conjunction with her role as a public school teacher, and not as an ordinary citizen.

Therefore, both of her First Amendment retaliation claims fail as a matter of law.  (Def.s'

Reply in Supp. at 2).  Plaintiff maintains that the war in Iraq is clearly a matter of great

public interest and therefore her comments on the subject are protected by the First

Amendment.  In reviewing these claims, it is clear that, if Ms. Mayer's speech on the Iraq

21

war is not protected under the First Amendment, then her retaliation claim–including her

contract "non-renewal" claim and her "chilling free speech" claim must also fail.[4]

In Gonzalez v. City of Chicago,  239 F.3d 939, 940 -941 (7th Cir. 2001) the

Seventh Circuit laid out the two-step test under which claims by public employees

asserting a violation against protected speech are to be analyzed:

> The first step, set forth in Connick v. Myers, is to
> determine whether the employee speaks "as a citizen upon
> matters of public concern." 461 U.S. 138, 147, 103 S.Ct.
> 1684, 75 L.Ed.2d 708 (1983). The second step is to balance
> the "interests of the [employee], as a citizen, in commenting
> upon matters of public concern and the interest of the State, as
> an employer, in promoting the efficiency of the public
> services it performs through its employees." Pickering v. Bd.
> of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811
> (1968). In determining whether speech is protected at step
> one, we must consider the content, form, and context of the
> speech. Connick, 461 U.S. at 147, 103 S.Ct. 1684.  Where
> speech is intended to serve a private or personal interest, it
> may not meet the standards for First Amendment protected
> speech. See Kokkinis v. Ivkovich, 185 F.3d 840, 844 (7th
> Cir.1999). "Our precedent makes clear ... that speaking up on
> a topic that may be deemed one of public importance does not
> automatically mean the employee's statements address a
> matter of public concern as that term is employed in
> Connick." Id.

Gonzalez, 239 F.3d at 940 -941.[5]

------

[4]  The inquiry into the protected status of speech involves a legal analysis, not a factual
one.  Connick, 461 U.S. at 148, fn. 7.  Further, the balancing of the interest in freedom of
expression against the employer's interests is a function to be performed by the judge, not
the jury.  Dishnow, 77 F.3d at 198.

[5]  Plaintiff argues that we should use the analysis the Seventh Circuit used in the
1996 case, Dishnow v. School District of Rib Lake, 77 F.3d 194, 197 (7th Cir. 1996).   In

(continued...)

In Pickering v. Board of Education,[6] 391 U.S. 563, 568 (1968), the Supreme Court held that public employees do not give up their First Amendment rights to comment on matters of public interest by accepting government employment, but that the State has an interest as an employer in regulating the speech of its employees which is unique from its interests in regulating the speech of its citizenry in general.  See also Connick v. Myers, 461 U.S. 138, 140 (1983).

----

[5](...continued)
this case the circuit court stated that when evaluating whether a public employee may be discharged or disciplined for speech, the public employee's First Amendment claim should be analyzed sequentially, in three steps: courts must (1) decide whether the speech, if uttered by someone who was not a public employee, would be protected; if so, then (2) decide whether the speech is merely a personal employee grievance of the type disqualified from protection in Connick; if so, the case is over; if not, then (3) decide whether the public employer had a "convincing reason to forbid the speech."  Dishnow v. School District of Rib Lake, 77 F.3d 194, 197 (7th Cir. 1996). Limiting the analysis to whether the speech in the abstract, would be protected if uttered by a private citizen is too simplistic an approach for this case, and should be applied only in cases more closely in line with the facts of Dishnow, where a high school guidance counselor alleged that he was terminated in retaliation for informing the media of school board violations of law and for writing articles for a local newspaper on topics of interest to the public.

[6]  In Pickering, the Court held impermissible under the First Amendment the dismissal of a high school teacher for openly criticizing the Board of Education on its allocation of school funds between athletics and education and its methods of informing taxpayers about the need for additional revenue.  Pickering's subject was "a matter of public concern" upon which "free and open debate is vital to informed decision-making by the electorate."  391 U.S. at 571-72; quoted by Connick, 461 U.S. at 145.  In Pickering, the teacher's erroneous public statements were:

> neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally.  In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public.

Pickering, 391 U.S. at 572-73.

Both parties agree that the topic of U.S. involvement in the Iraq war is a matter of public importance.  Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503 (1969) (stating that the Vietnam war is a matter of public concern).[7]  The role of the speaker is relevant because courts are more protective of citizen speech than they are of employee speech.  See Gonzalez v. City of Chicago, 239 F.3d 939, 940 (7th Cir. 2001) (noting that employee of the Chicago Police Department investigating and writing reports of public complaints against officers was performing a "routine requirement of the job" and thus the reports were not protected speech by a citizen which touched upon matters of public concern); Youker v. Schoenenberger, 22 F.3d 163, 166 (7th Cir. 1994) ("Simply stated, the speech in the present case is not protected because it was not a speech as a citizen [because the employee used an official medium to convey his message].").[8]  The courts are less protective of government interference in employee speech because –

the Government, as an employer, must have wide discretion

---

[7]  In Tinker, students wore black armbands to school in order to protest the Vietnam War.  The school banned the armbands under its dress code and the students challenged the school's policy based upon its impact on their First Amendment rights. The Supreme Court found that the student speech protesting the war pertained to a matter of public concern and was protected.  (Id.)  "The Supreme Court has more than once instructed that '[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" James v. Board of Education, 461 F.2d 566, 568 (2nd Cir. 1972), citing Shelton v. Tucker, 364 U.S. 479, 487 (1960), quoted in Keyishian v. Board of Regents, 385 U.S. 589, 603 (1967); Tinkerv. Des Moines Independent Community School District, 393 U.S. 503, 512 (1969).

[8]  Youker is distinguishable from the holding in Pickering, where the Court noted that the Plaintiff's employment was only tangentially and insubstantially involved in the subject matter of the public communication made by a teacher, and therefore the teacher should be regarded as a member of the general public.  Pickering, 391 U.S. at 574.

and control over the management of its personnel and internal
affairs.  This includes the prerogative to remove employees
whose conduct hinders efficient operation and to do so with
dispatch.  Prolonged retention of a disruptive or otherwise
unsatisfactory employee can adversely affect discipline and
morale in the work place, foster disharmony, and ultimately
impair the efficiency of an office or agency.

Connick, 461 U.S. at 151 (quoting Arnett v. Kennedy, 416 U.S. 134, 168 (1974) (J.

Powell, separate opinion)).

In analyzing the content in which the challenged speech occurred, it should be

noted that the classroom is unique in that it is under the exclusive control of the school

board and "public school teachers are not free, under the First Amendment, to arrogate

control of the curricula."  Boring v. Buncombe County Bd. of Educ., 136 F.3d 364, 369

(4th Cir. 1998) (selection of a controversial school play in drama class) (quoting Kirkland

v. Northside Indep. Sch. Dist., 890 F.2d 794, 802 (5th Cir. 1989) (use of unapproved and

controversial reading list in class)).[9]  In Tinker, the Supreme Court wrote:

If a regulation were adopted by school officials forbidding
discussion of the Vietnam conflict, or the expression by any
student of opposition to it anywhere on school property
except as part of a prescribed classroom exercise, it would be
obvious that the regulation would violate the constitutional
rights of students, at least if it could not be justified by a
showing that the students' activities would materially and
substantially disrupt the work and discipline of the school.

_____

[9]  Plaintiff's equivocations as to whether her speech was public or private is
essentially irrelevant, as Plaintiff herself points out, citing Givhan v. Western Line
Consolidated School Dist., 439 U.S. 410, 414 (1979) (holding that a public employee
does not forfeit his protection against governmental abridgment of freedom of speech if
he decides to express his views privately rather than publicly).  (Pl. Resp. at 14.)

25

Tinker, 393 U.S. at 513.  We do not believe that the inverse is true, however; school

officials are free to adopt regulations prohibiting classroom discussion of the war in Iraq

while allowing teachers and students the opportunity to engage in discussions about the

war elsewhere on school property without violating First Amendment protections.[10]

Ms. Mayer's comment on this matter of public concern occurred during a

classroom instruction session based on approved curriculum and in response to a

legitimate, altogether appropriate question from a student.  In her Complaint, Ms. Mayer

acknowledges, however, that she went beyond merely discussing the TFK article with her

LAUnCHED class by expressly interjecting her own personal views and activities against

the war in Iraq.  (Def.s' Memo. in Supp. at 18; Complaint, ¶ 19-20).[11]  Teachers,

including Ms. Mayer, do not have a right under the First Amendment to express their

---

[10]  In the Supreme Court's recent decision Rumsfeld v. Forum for Academic and
Institutional Rights, Inc., 2006 WL 521237, *9 (U.S.) (Mar. 6, 2006) the Court noted that "many
of its leading First Amendment precedents have established the principle that freedom of speech
prohibits the government from telling people what they must say."  These types of cases are
distinguishable from the case at hand, where the Plaintiff, Ms. Mayer, is being prohibited from
particular speech during class time, and not forced to speak on a particular topic.  For example in
"West Virginia Bd. of Ed. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943),
[the Supreme Court] held unconstitutional a state law requiring schoolchildren to recite the
Pledge of Allegiance and to salute the flag. And in Wooley v. Maynard, 430 U.S. 705, 717, 97
S.Ct. 1428, 51 L.Ed.2d 752 (1977), we held unconstitutional another that required New
Hampshire motorists to display the state motto-"Live Free or Die"-on their license plates."
Rumsfeld, 2006 WL 521237 at *9.

[11]  Defendants state: "According to the parents, Ms. Mayer did this on several
occasions, even after she was asked not to by Principal Rogers."  (Def. Memo in Supp. at
18; Hahn Aff., ¶ 9; Rogers Dep., p. 87).  However, the frequency of Ms. Mayer's
statements is clearly a disputed factual issue and therefore not appropriate for adoption on
summary judgment.  In this ruling, we are determining whether the comments made on January
10, 2003 were protected.

26

opinions with their students during the instructional period, particularly if the teacher's supervisors have directed her not to do so.  Here, the fact that Ms. Mayer's January 10, 2003 comments were made prior to any prohibitions by school officials does not establish that she had a First Amendment right to make these comments in the first place.  Previous judicial holdings have recognized that teachers do not have a First Amendment right to arrogate control of the curricula.  Elementary school classrooms in which the teacher has considerable influence over her students and where the students are required to be in attendance are highly unique settings.  Ms. Mayer, and teachers, generally, may find it difficult to lead a meaningful discussion without interjecting their personal opinions on important political topics; we assume in fact that, some school boards may encourage teachers to do so, in a balanced fashion.  The point is that whatever the school board adopts as policy regarding what teachers are permitted to express in terms of their opinions on current events during the instructional period, that policy controls and there is no First Amendment right permitting teachers to do otherwise.[12]  Had this case involved limitations or prohibitions on Ms. Mayer by the School regarding her practice of "honking for peace" off the school grounds, or writing editorials to the local newspaper, or discussing the Iraq war with other teachers at a time other than during the instructional period, we would expect a different outcome.

In summary, because the uncontroverted facts establish that Ms. Mayer expressed

---

[12]  To hold otherwise, would be to say that an elementary school teacher has a constitutional right to speak without limitation on any matter of public concern with her students during valuable instruction time.

her views to her students at a time and place and as part of her official classroom instruction, she was acting as an "employee," rather than as a "citizen," so that her speech was not constitutionally protected.  Thus, we do not need to undertake the kind of balancing called for in Pickering.  Defendants are entitled to summary judgment as a matter of law on Ms. Mayer's First Amendment claims, including her retaliation and "chilling" claims.  Summary judgment therefore shall be entered on Count I of Plaintiff's Complaint.

### C.    Count II:    42 U.S.C. § 1985 Claim

In Count II of her Complaint, Ms. Mayer invokes the protections of 42 U.S.C. § 1985, alleging that "Defendants conspired together to develop a plan of retaliation against Plaintiff and to stifle or chill her exercise of her First Amendment rights to free speech and to petition the government for redress of grievances."  (Complaint, ¶ 51).  Defendants contend that no claim under § 1985(3) is available to Ms. Mayer because that statute does not apply in the context of an "intra-corporate conspiracy" and further it does not apply to a deprivation of First Amendment rights, but only to Fourteenth Amendment equal protection claims.  Plaintiff has not responded to these arguments.  Def. Memo. in Supp. at 24.

In Trautvetter v. Quick, 916 F.2d 1140 (7th Cir. 1990), the Seventh Circuit stated:

> Under 42 U.S.C. §1985(3), a plaintiff must allege four
> elements to make out a valid cause of action:
> 1.    a conspiracy;
> 2.    a purpose of depriving, either directly or indirectly, any
>       person or class of persons of the equal protection of the

laws, or of equal privileges and immunities under the
laws;
3.       an act in furtherance of the conspiracy, and;
4.       an injury to his person or property or a deprivation of
any right or privilege of a citizen of the United States.

Id., 916 F.2d at 1153.

The first element of a §1985(3) claim requires that there be evidence of a
"conspiracy."  In the case at bar, the Complaint alleges that "[d]efendants conspired
together."  (Complaint, ¶ 51).  As noted in paragraphs 6-13 of the Complaint, each of the
individual Defendants, Superintendent Malloy, Board President Brown, Principal Rogers,
and Director Sklar is "employed" by the school corporation.  (Id., ¶¶ 6, 8, 10, 12).
Because Ms. Mayer has admitted that each of the alleged conspirators is employed by the
school corporation, conspiracy claims are barred by the "intra-corporate conspiracy"
doctrine.

The "intra-corporate conspiracy" doctrine states that intra-corporate discussions
and actions which have a discriminatory impact "will normally not constitute the
conspiracy contemplated by this statute [1985]."  Dombrowski v. Dowling, 459 F.2d 190,
196 (7th Cir. 1972).  In Travis v. Gary Cmty. Mental Health Ctr., Inc., 921 F.2d 108 (7th
Cir. 1990), the Court reaffirmed the holding in Dombrowski, as follows:

> [A]gain, intra-corporate discussions lie outside the statute's
> [§1985(3)] domain . . . managers of a corporation jointly
> pursuing its lawful business do not become "conspirators"
> when acts within the scope of their employment are said to be
> discriminatory or retaliatory. . . . Now that the question has
> been presented for decision, we conclude that it does not
> matter whether the corporate managers took multiple steps to

29

> carry out their plan; intra-corporate discussions are not
> 'conspiracies.'

Travis, 921 F.2d at 110-111.  The Seventh Circuit applied this doctrine to governmental

entities in Wright v. Ill. Dep't. of Children and Family Servs., 40 F.3d 1492, 1508 (7th

Cir. 1994).

Because the Complaint contains only allegations of intra-corporate discussions

between the individual Defendants, all of whom are school corporation employees, no

conspiracy under 42 U.S.C. §1985(3) can be found to exist as a matter of law, and

consequently, Count II of Plaintiff's Complaint warrants dismissal on summary

judgment.[13]

### D.   Count III:   Breach of Employment Contract

In Count III of her Complaint, Ms. Mayer alleges that the School's action of

non-renewal of her Regular Teacher's Contract constituted a "breach of the employment

contract."  (Complaint, ¶ 56).  More specifically, she alleges that the School improperly

failed to renew her contract even though she had "fully performed her obligations

pursuant to her contract of employment."  (Complaint, ¶ 54).  Indiana courts have stated

that the decisions of school boards to non-renew non-tenured teacher contracts "should

not be disturbed except in cases where it is arbitrary and capricious, without reasonable

basis or in direct violation of the Constitution."  Tilton v. Southwest School Corp., 151

---

[13]  Because Count II of Plaintiff's Complaint is dismissed for the specified reasons,
we do not address Defendants' contention that Ms. Mayer's § 1985(3) claims also must
fail because they do not involve racial or class-based animus.  Def.s' Memo in Supp. at
25.

Ind. App. 608, 631 (1972) (interpreting an earlier version of Indiana's Teacher Tenure Act).

The Indiana's Teacher Tenure Act (I.C. § 20-6.1-1, et seq.) ("Tenure Act") governs the hiring and firing of teachers by public school corporations and its protections are incorporated fully into Ms. Mayer's contract.  The statute creates three classifications for teachers:  non-permanent, semi-permanent, and permanent teachers.  Under the Tenure Act, a non-permanent teacher, such as Ms Mayer, has been employed for two years or less and may be terminated "(1) for any reason considered relevant to the school corporation's interest; or (2) because of a teacher's inability to perform the teacher's teaching duties."  (I.C. § 20-6.1-4-14(I)).

Defendants contend that the reason the School cancelled Ms. Mayer's nonpermanent teaching contract was based upon her inability to work effectively with students and parents.  This contention is reflected in the recorded created for this litigation and specifically in the End of Year Report and March 26, 2003 Memo.  Defendants further contend that Ms. Mayer refused to follow the directives from her superiors, failed to follow school policy in terms of her absences, and failed to correct these various deficiencies after being apprised of them through multiple evaluations.  Defendants assert that Ms. Mayer's conduct easily meets the statutory requirements.  Def. Memo in Supp. at 16.

Plaintiff objects to summary judgment on this claim, contending that, contrary to school policy and her contract, Plaintiff was never advised of any parent complaints by

31

Defendants, other than the Hahns' complaint about Plaintiff's speech and the Foshas'

complaint about a hand gesture.[14]  Plaintiff contends that "the decision to terminate any

teacher – permanent or non-permanent – cannot be based on complaints that have not

been brought to the teacher's attention."  Mayer Surreply, at 3 (citing Sklar Dep., p. 70).

While questions of fact regarding whether Plaintiff was aware of every complaint made

against her may exist, they are not material factual disputes.[15]  On the basis of the Hahns'

and the Foshas' complaints alone, school officials would be justified in concluding that

Ms. Mayer's termination would be (1) in the school corporation's interest or (2) evidence

_____

[14]  Most of Plaintiff's argument in this respect is irrelevant based on our holding
that Plaintiff did not have a First Amendment right to express her opinions on the war in
Iraq with her students during the classroom instructional period.  Plaintiff frames her
argument as follows:

> Assuming that terminating Plaintiff's contract for an illegal
> reason could not, as a matter of law, be considered a reason
> 'relevant to the school corporation's interest,' and assuming
> further that the jury finds in Plaintiff's favor on her First
> Amendment claims, it would logically follow that Mayer's
> contract was not terminated because of any inability to
> perform her duties.  Stated differently, in the absence of the
> alleged illegal conduct by Defendants in this case, it is
> reasonable to infer that Plaintiff would have been renewed
> and would have continued to work for MCCSC.  Mayer's
> intent, as Defendants knew, was to work into an
> administration position with the school.

(Pl.'s Resp. at 34, citing Mayer Dep., pp. 45-46).

[15]  The numerous affidavits submitted by parents, and the deposition of Principal
Rogers, as well as corresponding exhibits support the position that Ms. Mayer was aware
that parents were complaining of her teaching techniques.  Ms. Mayer's "self-serving
statements, unsupported by specific concrete facts reflected in the record" that she was
unaware of these complaints will not suffice to preclude summary judgment.  Albiero v.
City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001).

of Ms. Mayer's inability to perform her teaching duties.  See IND. CODE § 20-6.1-4-14(i).

Therefore, summary judgment shall issue as to Count III of Ms. Mayer's Complaint

alleging breach of her employment contract.

### E.       Count IV:   Indiana Code § 20-6.1-4-14

Finally, in Count IV of the Complaint, Ms. Mayer alleges that the School failed to

comply with the requirements of IND. CODE § 20-6.1-4-14[16] by (1) failing to give her a

statement of reasons for the non-renewal of her contract; (2) refusing to provide an

appropriate written evaluation; (3) refusing to permit a conference with the School Board;

and (4) failing to have an appropriate reason for nonrenewal.[17]  Ms. Mayer has failed to

respond to Defendants' arguments regarding Count IV, based on IND. CODE §

20-6.1-4-14 and, therefore, we shall assume that the facts and evidence adduced by

Defendants on these issues exist without controversy and are controlling of our analysis.

(See L.R. 56.1(e)).

With non-permanent teachers such as Ms. Mayer, Indiana law lays out three

conditions precedent to the nonrenewal of their contracts: (1) the school shall "provide

---

[16]  At the time this opinion is being issued, Ind. Code Article 6.1, titled "Teachers" has been repealed by repealed by P.L. 1-2005, sec. 240, effective July 1, 2005 and in relevant part by Ind. Code §§ 20-28-7-8 (continuation of contract), 20-28-7-9 (rights of nonpermanent teacher - evaluations - notice of consideration of nonrenewal), 20-28-7-10 (right of nonpermanent teacher to conference - procedure).

[17]  Defendants note that ground [4] is redundant to Count III and that our resolution of that issue necessarily covers this re-stated contention.  See Def. Memo in Supp. at 26 n.6.  We agree, holding that Defendants had an appropriate reason for non-renewal of Plaintiff, as discussed supra Section D.

the teacher with an annual written evaluation of the teacher's performance before January 1 of each year;" (2) "On or before May 1, the school corporation shall notify the teacher that the governing body will consider nonrenewal of the contract;" and, (3) "Upon the request of the teacher, and within fifteen (15) days of the receipt of the notice of the consideration of contract of nonrenewal, the . . . [School] shall provide the teacher with a written statement . . . giving the reasons for the noncontinuation of the teacher's contract."  Def.s' Memo in Supp. at 27.  Compliance with these three requirements is a "condition[] precedent to a valid nonrenewal of a contract," and the failure to comply with all of them will invalidate the cancellation or nonrenewal decision.  Lewis v. Bd. of Sch. Trs. of the Charles A. Beard Mem'l Sch. Corp., 657 N.E.2d 180, 184 (Ind. Ct. App. 1995).  In contrast, the statutorily-mandated conference with the school board is not deemed a condition precedent, and, if a school fails to hold such a meeting, the appropriate remedy is to remand the matter to the school board to permit the conference to be conducted.  (Id.)

> 1.   Annual Written Evaluation

Ms. Mayer claims that the School "refus[ed] to provide appropriate written evaluations" to her.  (Complaint, ¶ 58).  In particular, she appears to argue that Principal Rogers failed to give her an evaluation prior to January 1, 2003.  However, this contention ignores the fact that prior to January 1, 2003, Ms. Mayer had received a completed "Form B: Professional Staff Evaluation," prepared by Assistant Principal Miller on November 21, 2002. (Def.s' Memo in Supp. at 28; citing Miller Dep. pp. 59-61;

Exh. 6).  Thereafter, Ms. Mayer received two additional evaluations, one in February and one in April of 2003, from the School.  (Rogers Dep, p. 23, Exh. 7, Exh. 8).  Principal Rogers also prepared an End of Year Report, utilizing Form D, reflecting her assessments of Ms. Mayer's performance.  (Rogers Dep., p. 23, Exh. 14).

We agree with Defendants that, while IND. CODE § 20-6.1-4-14 requires an "annual written evaluation of the teacher's performance before January 1 of each year," it does not specify the form or format for that evaluation, apparently leaving that to the discretion of the Schools and the teachers' unions.  (See Def.s' Memo in Support at 29).  Here, the School utilized "Form B:  Professional Staff Evaluation," and the statute does not forbid that.  Therefore, we find that the first requirement of IND. CODE § 20-6.1-4-14 was satisfied by Defendants.

> 2.  <u>Written Statement Giving Reasons for the Noncontinuation of the Teacher's Contract</u>

Ms. Mayer cites, as a first basis for her breach of contract claim under IND. CODE § 20-6.1-4-14, that the School "refus[ed] to give Plaintiff a statement providing the reasons for the non-continuation of Plaintiff's contract."  (Complaint, ¶ 58).

Under IND. CODE § 20-6.1-4-14(b):

> "Before a teacher is refused continuation of the contract under subsection (a), the teacher has the following rights, which shall be strictly construed:  Upon the request of the teacher, and within fifteen (15) days of the receipt of the notice of the consideration of contract of nonrenewal, the . . . [School] shall provide the teacher with a written statement . . . giving the reasons for the noncontinuation of the teacher's contract."

This requirement is mandatory and its fulfillment is a condition precedent to the proper termination of Ms. Mayer's contract.  <u>Lewis v. Bd of Sch. Trs. of the Charles A. Beard Mem'l Sch. Corp.</u>, 657 N.E.2d 180, 184 (Ind. Ct. App. 1995).

The problem with Plaintiff's claim is that the statute imposes the obligation on the teacher to first "request" the statement of reasons.  The evidence here establishes that Ms. Mayer never requested such a statement of reasons for her termination.  (Def.s' Memo in Supp. at 28).  During the meeting on April 24, 2003, Ms. Mayer was informed that Principal Rogers was going to be recommending the nonrenewal of her contract at the School Board hearing scheduled for that evening.  (Mayer Depo., p. 143-149).  Ms. Mayer testified that immediately after the meeting with Principal Rogers she went to the school office to find a substitute teacher to cover her class and then went directly home.  (Id. at 144-147).  Ms. Mayer testified that she telephoned Principal Rogers later that day to inform her that she was not resigning and that "the school system had not followed proper procedure in [her] dismissal and that [she] was contacting [her] attorney."  (Id.) Nonetheless, the School Board terminated Ms. Mayer's contract at its meeting on the evening of April 24, 2003.  Because Ms. Mayer never requested a statement of the reasons for her termination, the School was not required to provide it to her.  (Def.s' Memo in Supp. at 28, citing IND. CODE § 20-6.1-4-14(b)).  Therefore, the third requirement of IND. CODE § 20-6.1-4-14 was not violated by the Defendants.

### 3.    School Board Conference

The final reason that Ms. Mayer cites as the basis for her breach of contract claim

36

and her claims under I.C. § 20-6.1-4-14 is that the School "refus[ed] to hold a conference with the governing body of the School Corporation." (Complaint, ¶ 58). Such a conference is not a condition precedent to contract termination, and the appropriate remedy for the failure to conduct that meeting is to remand the matter to the School Board to do it. Lewis v. Bd of Sch. Trs. of the Charles A. Beard Mem'l Sch. Corp., 657 N.E.2d 180, 184.

Defendants state that "there is no dispute that the Tenure Act requires a school, if requested to do so by the teacher, to provide that teacher a conference after the nonrenewal of a teacher's contract." Def.s' Memo in Supp. at 31. Indiana Code § 20-6.1-4-14(a)(3) provides that "[a] conference shall be held with the governing body, or at the direction of the governing body, with the superintendent or the superintendent's designee, not more than ten (10) days following the day the governing body receives the request." There is no dispute that, following after Ms. Mayer's non-renewal on April 24, 2003, she initially requested such a conference. (Mayer Depo. p. 175, Exh. 7 (Fax to Ms. Sklar)). It is also undisputed that the School offered to schedule the conference. However, the parties ultimately agreed that no conference was needed, as documented in a letter from Ms. Mayer's former attorney dated July 17, 2003: "We also confirm the agreement made that there would be no need to request a conference with the School Board as required by IC 20-6.1-4-14 because both sides agree that such a conference would be an act of futility." (Def.s' Memo in Supp. at 31; Mayer Depo., p. 175; Defendants' Responses to Plaintiff's First Request for Production of Documents, 7/17/03

37

letter).  Because it appears that the parties jointly agreed that a conference was unnecessary and would be, indeed, an act of futility, Ms. Mayer's contention that the School failed to offer her a conference lacks any evidentiary support.  Accordingly, Count IV is also subject to summary judgment.

### F.    Claims Against Individual Defendants

Having dismissed the four counts of Plaintiff's complaint on summary judgment we need not address Defendants' argument that each of the individual Defendants is entitled to judgment in their favor as a matter of law.[18]

### Conclusion

For the foregoing reasons, we hold that Defendants are entitled to summary judgment in their favor on all Counts.  IT IS SO ORDERED.

Date:    03/10/2006

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Michael L. Schultz
mlslaw@sbcglobal.net

Thomas E. Wheeler II
LOCKE REYNOLDS LLP
twheeler@locke.com

---

[18]  The School sought summary judgment on the official capacity claims under §1983 against the individual Defendants and on the federal claims against the individual Defendants based upon qualified immunity.  The School also sought dismissal of the individual Defendants as to Count III and IV of the Complaint based on a lack of privity regarding the employment contract between Plaintiff and the School.

Heather L. Wilson
LOCKE REYNOLDS LLP
hwilson@locke.com